UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IAGO BURNS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0499-DFH-WTL |
| | ) | |
| GENERAL MOTORS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Iago Burns contends that defendant General Motors Corporation terminated his employment because he is African-American.  GM maintains that Burns had reached the penultimate step in its progressive discipline system in August 2004.  When he was tardy without an acceptable excuse on October 28, 2004, termination was the last step left in the process.  GM has moved for summary judgment.  On August 16, 2007, the court denied the motion and indicated that an entry detailing the reasons would follow.  The case is set for trial on September 17, 2007.

*Standard for Summary Judgment*

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled

to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's ruling on a motion for summary judgment is akin to that on a motion for directed verdict. The essential question for the court on both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255. If the non-moving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The moving party need not positively disprove the opponent's case; it may prevail by establishing the lack of evidentiary support for that case. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

*Facts for Summary Judgment*

The following statement of facts is not necessarily accurate in all respects but reflects the application of the standard for summary judgment to the designated evidence, giving plaintiff the benefit of conflicts in the evidence and all reasonable inferences in his favor. Pursuant to Local Rule 56.1, the court has assumed as accurate any material facts set forth in defendant's brief that were

appropriately supported if they were not specifically identified as disputed by plaintiff, with appropriate references to supporting evidence in the record.

Plaintiff Burns began working for GM in March 1981. He was at all times an hourly, union employee who worked at several different positions and was subject to several layoffs and recalls. In 2000, Burns became a skilled trades apprentice at GM's Indianapolis Truck and Bus Metal Fabrication facility, following a successful test and interview process. This hourly position was in the Truck Repair Department. He initially reported to Hank Jacoby. During the time leading up to his termination and at the time he was fired, Burns worked under supervisor Ryan Tinsley. However, the termination decision was made by three members of the Labor Relations Department: Stephen Sprecher, Robert Chavarry, and Kevin Sabo.

Pursuant to its national labor agreement, GM had two progressive disciplinary tracks that applied to its hourly employees. One track was for general violations of company policies and shop rules, including the shop rule requiring timely arrival to work. A second track existed for violations of the attendance rule, which included unexcused full day absences or a tardy of more than four hours duration. According to the deposition testimony of Stephen Sprecher, a GM Labor Relations Manager and the local facility's Assistant Personnel Director, the second track was originally created during the 1993 national labor negotiations. GM and the union intended to allow quicker escalation through progressive discipline for

employees who violated the attendance policy, and to offer an early opportunity for intervention through referral to an employee assistance program if an employee's personal problems were at the root of the attendance problem.  The two progressive tracks were as follows:

| REGULAR DISCIPLINE TRACK | SPECIAL ATTENDANCE TRACK |
|---|---|
| 1. Written Reprimand | 1. 1st Written Warning |
| 2. Suspension: Balance of Shift ("BOS") +2 Days | 2. 2nd Written Warning |
| 3. Suspension: BOS+5 Days | 3. Suspension: BOS+3 Days (Referral to EAP) |
| 4. Suspension: 14 Days (calendar) | 4. Suspension: BOS+14 Days |
| 5. Suspension: 30 Days | 5. Suspension: BOS+30 Days |
| 6. Discharge | 6. Discharge |

A set of 42 shop rules applied at the GM facility.  Rule 8 barred absence without reasonable cause.  Rule 9 prohibited tardiness.  By GM's own account, the disciplinary system was applied with a great deal of discretion.  GM policy called for a disciplinary interview to be conducted when possible before issuance of any discipline.  Not every shop rule violation resulted in the company taking one of the disciplinary steps.  Burns admits to having a history that includes undisciplined tardies.  Other employees were absent or arrived late without being disciplined as well.  With each rule violation, management exercised their discretion, based upon the employee's disciplinary history, in determining whether to issue discipline.  Discretion was also employed in deciding how long the discipline taken would remain on the employee's record before being "wiped clean."  For example, if an employee was issued a second written warning for tardiness or another shop rule violation, it was up to the supervisory personnel

issuing the discipline to decide whether that warning would remain on the employee's record for three weeks, three months, or indefinitely, thereby directly affecting the potential for a suspension for a similar violation one month later. Discretion was also available for managers to skip steps in the progressive discipline sequence if they found that the employee's malfeasance was severe in nature or effect. Like most management actions, the issuance of discipline was subject to the  grievance procedure if the employee and union decided to pursue it.

Plaintiff reached the 30-day suspension level under the Discipline Track when, on August 19, 2004, GM suspended him for having violated its sexual harassment policy two days earlier.  On August 17th, a female employee complained to Human Resources that Burns had continually referred to her as "Beautiful" when greeting her and on that date told her that she "got sexier by the day."  His statement was followed by a discussion between the two, the details of which are disputed, but which ended with the female employee making her complaint to HR.  Burns claims that in the past, the female employee had told him that she did not mind being referred to as "Beautiful."  An investigation of the incident by GM provided corroboration for the complaint.  Although Burns disagreed, he received a 30-day suspension.

Burns filed a grievance in protest over the discipline for sexual harassment. On August 26, 2004, the following four point settlement of the grievance was reached:

> 1.      Employee, by his own admission, is guilty as charged.  However, on a non-precedent basis and without prejudice to the position of either party, Management agrees to attempt to notify employee to return to work at the beginning of his regularly scheduled shift on Friday, September 3, 2004.
>
> 2.      Instant notation shall be modified to reflect a violation of Shop Rule #22 "Threatening, intimidating, coercing, or interfering with employee or supervision at any time."
>
> 3.      Employee's penalty record will reflect for progression purposes a thirty (30) day disciplinary layoff.
>
> 4.      In addition, instant notation shall remain on employee's disciplinary record for a period of one (1) year.

Though the settlement of the grievance reflects Burns' admission of the underlying conduct, he has testified that he did not engage in sexual harassment.

Several years earlier, Burns had been removed from a "team" at the GM facility after a female employee on that team complained after he presented her with a ring.  Prior to her complaint, Burns had spoken to her and touched her shoulder or neck in a manner that she apparently took to be an uninvited advance.  After he later gave her the ring, she complained that he was out of line and was making her uncomfortable.  Burns took issue with that interpretation as well, and filed a grievance after he was removed from the team.  The grievance was not successful.

That was not the only time GM took action outside the formal disciplinary steps in an attempt to curb conduct by Burns that violated shop rules or company policy.  While an apprentice, Burns received periodic progress reports that also addressed issues such as timely attendance.  Burns says he remembers being provided with only two of the four reports in his personnel file covering the first four months of 2002.  All four of the reports list his progress as unsatisfactory and have the "Irregular" box checked under the category of "Punctuality," with a note on the number of tardies Burns had accumulated since the previous appraisal and an indication that his punctuality problems had been discussed with him.

The record now before the court does not contain back-up documentation on the conduct that prompted the two-week, five-day and two-day suspensions he received after the written warning issued for reporting late to work on February 8, 2002.[1]  The record includes a computer-generated disciplinary summary sheet for plaintiff that indicates his first suspension in the skilled trades area was given to him by Hank Jacoby in June 2002 for reporting late to work, followed by a five-day suspension in September 2002 for what is described as"RefuseSupv."  A two-week suspension later in September of that year, for what is described quite cryptically as "Threaten" in the summary, is also listed.  That two-week

---

[1]In light of the importance GM is said to have placed on the disciplinary history of an employee when using its discretion regarding the discipline to issue and how long it should stay on the person's record, the court finds the scant submission (by both sides) of formal disciplinary documentation from Burns' record  a bit odd.  Submission of the complete disciplinary records would have put the case in a better perspective from all points of view.   There is no suggestion that the forms were lost or do not exist.

suspension is listed as having been removed from his record on December 17, 2002. The result seems to have been that GM found the sexual harassment policy violation significant enough to skip the two-week suspension step and to move from the five-day suspension remaining on his record to one of 30 days.

In any event, in October 2004, after the resolution of his grievance of the 30-day suspension, Burns was working at the penultimate step on the regular disciplinary track. On October 18, 2004, Burns' mother died. She had lived in California. On October 26th and 27th, Burns failed to show up for work. On October 28th, he reported to work two hours late. When he reported on the 28th, he requested bereavement leave for his absences on the two previous days, as well an advance request for bereavement leave to apply to the three work days that fell between October 29th and November 3rd. His request for bereavement leave did not include the day of his request, October 28th, but he left work that day shortly after obtaining the necessary bereavement leave paperwork from Human Resources, and he received approval of the leave for the dates he had requested from his supervisor, Ryan Tinsley.

GM records indicate that Burns had unexcused absences on November 8th, 9th and 10th. Burns does not remember being absent those days and is suspicious of GM's record keeping. However, when asked at his deposition if he could be certain that he attended work on those days, he admitted he could not say one way or the other with any certainty. On November 11th, Burns did go to

work.  Tinsley, his supervisor, reported that day that Burns for the first time told him the October 28th tardy was related to the death of his mother.  GM's records indicate that Burns told Tinsley on the 28th that he was late that day because he had stayed up late and overslept.  Burns contends that while he may have said something about staying up late, that was not the reason he offered as an excuse for being late that day.  At least for purposes of summary judgment, the court must assume that Tinsley knew Burns' mother's death was the real reason behind his tardiness and other attendance problems at the time.  After all, on the 28th, Tinsley approved Burns' bereavement request covering all the other days of that week.  See also Def. Ex. 22 (Tinsley reporting that Burns had said on October 28th that his absence was related to the death in his family).

On November 12, 2004, GM terminated Burns' employment.  The stated reason was his tardiness on October 28th, which GM determined to be unexcused and a continuation of long-standing tardiness problems.   The Notice of Disciplinary Action form signed by the Supervisor of Labor Relations, Robert Chavarry, describes the violation of rules as follows:

> Shop Rule #9 "Reporting Late For Work" & Shop Rule #40 "Repeated Violations of Shop or Safety Rules."
>
> On 10/28/04 you, by your own admission, reported late to work by 1 hour + 59 minutes, according to GMTKS [General Motors Time Keeping System].  The reason for your tardiness, as offered by yourself to your Supervisor, Ryan Tinsley is deemed unacceptable and does not satisfactorily excuse your tardiness.  For this obvious violation, plus your repeated violations of Local Indianapolis MFD [Metal Fabrication Division] progressive disciplinary Shop Rules, you are hereby discharged.

Plaintiff and his union filed a grievance over his termination.  The grievance asserted that the discharge was "unjust", "unfair," and "without just cause." There was no mention or allegation of racial discrimination contained in the grievance, which the union eventually dropped.  Burns waited more than one year, until December 14, 2005, to file a charge of discrimination with the Equal Employment Opportunity Commission.  After that charge had been processed and dismissed for lack of timely filing, Burns brought this lawsuit, claiming discrimination under both Title VII of the Civil Rights Act and 42 U.S.C. § 1981.

## Discussion

Though it makes little practical difference in this case, Burns' claim under Title VII is time-barred.  Under Title VII, an employee must file a charge of discrimination with the EEOC or its state counterpart within 300 days of the alleged discriminatory event.  *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 270 (7th Cir. 2004).  Burns did not file his charge within 300 days of his termination and failed to respond to GM's timeliness argument in connection with the pending motion.  Consequently, his Title VII claim fails.  This failure makes little practical difference because Burns has also alleged discrimination under 42 U.S.C. § 1981, which prohibits racial or ethnic discrimination in contractual relations, including employment relationships.  On the merits, a claim under § 1981 is analyzed in a manner identical to a Title VII discrimination claim. *Alexander v. Wisconsin Dept. of Health and Family Services*, 263 F.3d 673, 681-82 (7th Cir. 2001).  However, a plaintiff need not file an administrative charge of

discrimination before bringing a § 1981 claim.  Any action must be filed within four years after the alleged discrete discriminatory act.  *Pruitt v. City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006).


Burns argues that he has established a prima facie case of discrimination under the three-step indirect proof template set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  When a plaintiff pursues this indirect method of proof, he must establish the following:

1. He is a member of a protected class;

2. He was meeting the legitimate employment expectations of his employer;

3. He suffered an adverse employment action; and,

4. Similarly situated employees who were not members of the protected class were treated more favorably.

*Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).  If a plaintiff succeeds in making that prima facie showing, the defendant must articulate a legitimate non-discriminatory reason for taking the adverse action.  *Id.*  If that occurs, then the burden shifts back to the plaintiff, who must demonstrate that the reason proffered is a pretext for discrimination or that the decision made by the employer was tainted by race-based motivations.  *Id.*  In opposing a motion for summary judgment, the plaintiff need not prove his case but must come forward with evidence that would allow a reasonable jury to find in his favor.

GM argues that Burns was not meeting its reasonable expectations because he was consistently disregarding or violating its shop rules and had progressed on the disciplinary scale to the point where he had been suspended for 30 days. It also contends that no similarly situated employee was at that penultimate disciplinary step or treated more favorably under similar circumstances, and that the decision makers acted for the legitimate non-discriminatory reasons set forth in the disciplinary action form.  Burns admits to having incurred discipline for violating shop rules and admits the violations as well, at least with respect to untimely arrival to work.  He also does not deny that he was at the last step of the discipline process where termination would result with any further infraction. However, Burns argues that he was at that last step, and others were not, because other white employees who broke the rules had not been disciplined as he had been for similar conduct.

The undisputed facts show that plaintiff Burns was far from a model employee, but federal laws prohibiting employment discrimination do not protect only model employees.  An employer may not intentionally discipline African American employees more harshly than white employees.  "[W]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner (i.e. applied expectations to similarly situated . . . employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge – allowing the plaintiff to establish a *prima facie* case, stave off summary judgment for the time being, and proceed to

-12-

the pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (plaintiff asserted Title VII and ADEA claims); see also, *Elkhatib v. Dunkin Donuts, Inc.*, __ F.3d __, 2007 WL 1976126, *3-4 (7th Cir. July 10, 2007) (applying analysis from *Peele* to § 1981 claim).

Burns claims that Ricky Holton and Terry Dickerson, white employees who worked in his department under the same supervisor, were routinely absent or late without receiving discipline. Holton is the primary target of comparison. Burns has offered GM records demonstrating that Holton had numerous unexcused absences (69 between mid-August 2004 and mid-April 2006) that drew limited discipline (9 disciplinary actions). GM has not argued that it has a no-fault attendance policy, and GM concedes that managers exercise discretion when deciding whether to issue discipline. In fact, Burns admits to numerous occasions when he was late and did not suffer discipline. Nevertheless, from a pure numbers perspective, it appears that Holton had more unexcused absences that went without discipline than Burns had tardies that went unpunished. The court assumes as much for purposes of summary judgment.

GM's first response to this anomaly is to contend that because discipline for absences follows a track different from the discipline imposed for late arrivals and other rule violations, it makes no difference how often Holton was absent without recourse. In other words, GM argues that since it treats absences and tardies differently, and Holton's main problem was his unexcused absences, the court

must view the two individuals as dissimilar.  The court does not accept that the distinction that GM makes between the two tracks of discipline is enough to disqualify Holton as a comparator, at least as a matter of law.  The similarly situated inquiry is a flexible one that considers the context of the case. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007); accord, *South v. Illinois Environmental Protection Agency*, ___ F.3d ___, ___, 2007 WL 2142296, *4 (7th Cir. July 27, 2007) (applying *Humphries*); *Crawford v. Indiana Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (cautioning against overly rigid application of "similarly-situated" requirement).  The comparator need not be a clone or the circumstances identical, but the comparison must show substantial similarity.  *Humphries*, 474 F.3d at 404-05.  In this case, Burns, Holton, and Dickerson had the same job, the same supervisor, and the same set of rules to follow.  Further, while there are two discipline tracks, those tracks are still very similar and both allow managers to exercise their discretion.

As GM points out, the undisputed facts show that neither Burns nor Holton nor Dickerson was punished for every violation.  While Holton had numerous unexcused absences that went without punishment, by Burns' own admission, Holton was disciplined twice as many times for being late as Burns was.  Holton never made it past the five- day suspension step on the "General Discipline Track" that applied to tardies and other rule violations.  The record does not show how many steps on the "Special Attendance Track" his discipline took him, though he was not fired.  The record also does not show (or if it does, the parties have not

pointed it out to the court) with any specificity the number of times that either of the two was late to work and the corresponding number of times that such a tardy generated a disciplinary response.   Burns' deposition testimony simply acknowledges that he was late an unspecified number of times without receiving discipline.   The record does not show whether Burns escaped punishment for unexcused absences, as Holton did.   The attendance side of Burns' disciplinary record was not provided, nor has anyone filed any document that would detail Burns' attendance history, similar to the one that was filed detailing Holton's attendance through the years.

The question, as framed in *Peele* and *Elkhatib* and other cases dealing with allegations of discrimination in discipline, is whether plaintiff Burns has brought forth sufficient evidence to support an inference that GM applied its expectations, or in this case applied its discretion in issuing discipline, based on Burns' race. If he has, the analysis moves forward to assessing whether GM has supplied a legitimate non-discriminatory reason for its actions and, if so, whether a jury could find that the stated reason is really just a pretext for a race-based decision. Giving Burns the benefit of every bit of this underdeveloped record, he survives the first step in the analysis.   First, while the evidence supports the fact that Burns was tardy on October 28th and was subject to discipline for that late arrival, it also appears that his supervisor knew of his mother's recent death and could easily have excused the violation.   It is hard to imagine that Tinsley thought the tardy that day was entirely unrelated to Burns' mother's death.   The only thing

Burns did that day was complete paperwork for bereavement leave for the preceding and following days.  That is not to ignore the fact emphasized by GM, that Burns was a frequent rule offender.  But so were Holton and Dickerson. GM's own labor relations witness testified that the attendance track came into being in part because of a need to escalate discipline for employees with absence problems.  In other words, according to GM it had been focusing its disciplinary attention on attendance problems.  Yet, giving Burns the benefit of conflicts in the evidence and favorable inferences from the evidence, for some unexplained reason Holton and Dickerson often escaped discipline on the attendance side of the discipline track.  GM made no effort to explain why that was so, apparently thinking it would carry the day with its argument that the two tracks were so different that they could not be compared as a matter of law.

GM does advance a legitimate reason for terminating Burns' employment. He was at the last step of the disciplinary process and had reached that step on the basis of a claim of sexual harassment against him, the second one of those in his career.  Burns says that is pretext.  A jury may find pretext, and thus may infer discriminatory intent, where the employer's stated reason is not credible or is factually baseless.  *E.g.*, *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007); *Perez v. Illinois*, 488 F.3d 773, 777-78 (7th Cir. 2007).

In this case, there is no explicit evidence of racial bias attributable to the final decision makers, though there is some evidence of racial bias on the part of

Burns' supervisor before Tinsley.   Nevertheless, giving Burns the benefit of conflicts in the evidence and reasonable inferences from the evidence, a jury could find dramatic disparity in the treatment of Burns' and Holton's and Dickerson's attendance problems.   Holton's problems were much more severe, but they never led to comparably severe discipline.   A jury could a substantial racial disparity in the treatment of Burns' and Holton's and Dickerson's attendance problems.   In other words, a jury might reasonably find that a major reason that Burns was vulnerable to termination was the result of racial disparities in discipline.

GM's strongest argument is that Burns had the recent 30-day suspension for sexual harassment.   (The court adopts the term, though it is clear that Burns' offensive actions in August 2004 fell far short of anything that might be actionable under Title VII.)   At the same time, Burns was actually fired for showing up late on October 28th, the one day he showed up in the midst of a number of excused absences based on his mother's death.   And the oddest aspect of the case is that if Burns had not shown up at work at all on October 28th – *i.e.*, if that day had been an absence rather than a tardy – then he probably would not have been subject to termination at all.   The apparent disparity between the sanction of termination and the stated reason, tardiness on October 28th, when an unexcused absence would not have led to termination, adds support to an inference of pretext in this case.

Of course, the sexual harassment discipline may serve to distinguish Burns from Holton and Dickerson.  If Burns' situation were otherwise identical to Holton's and Dickerson's, the court might be able to grant summary judgment for GM.  But in this case, a jury could reasonably find that Holton and Dickerson were not otherwise identical to Burns but in fact had far worse records than Burns did.  The dramatic differences in their treatment tend to support the inference of pretext and persuade the court that Burns should be permitted to present his case to a jury.  Burns, Holton, and Dickerson performed the same job under the same supervisor.  They were all subject to the same standards and discipline, at least in theory.  Yet a jury could find from this evidence that the white employees performed much worse and were treated much better than the African American employee.  Ultimately, the court concludes that the differences here were so stark (again, viewing the evidence in the light reasonably most favorable to plaintiff.

*Conclusion*

Federal laws prohibiting race discrimination in employment apply to poor employees as well as to good ones.  The ultimate question in this case is whether Burns would have been fired if he had been white and everything else had been the same.  See *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994).  The relatively sparse record in this case would permit a jury to answer no, in light of the dramatic differences in treatment of similarly situated white employees.  GM will have ample opportunity to argue that the differences in their situations

justified the different treatment, and a jury might well agree with GM.  But the court is satisfied that those are issues for the jury to decide as a matter of fact rather than for the court to decide as a matter of law.  GM's motion for summary judgment has been denied for these reasons.

Date: August 29, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Mark Jason Crandley
BARNES & THORNBURG LLP
mcrandley@btlaw.com

Bridget B. Romero
LATHROP & GAGE L.C.
bromero@lathropgage.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com